## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS
### (Topeka Docket)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 19-cr-40021-DDC** |
| | ) | |
| | ) | |
| **HARCROS CHEMICALS, INC.** | ) | |
| **Defendant.** | ) | |

### DEFENDANT HARCROS CHEMICALS INC.'S SENTENCING MEMORANDUM

COMES NOW, Defendant Harcros Chemicals Inc. ("Harcros"), by and through the undersigned counsel respectfully submits the following background and analysis under 18 U.S.C. §§ 3553, 3571, and 3572 for consideration in support of the parties' proposed Rule 11(c)(1)(C) plea agreement for sentencing.

### I.    Procedural Background

1.    The Government filed its first Indictment charging Harcros and Midwest Grain Products, Inc., on March 6, 2019.  Doc. 1.

2.    Following a Motion to Dismiss, the Government filed a Superseding Indictment as to both Defendants—MGP Ingredients, Inc. ("MGPI") and Harcros—on May 29, 2019.  Doc. 22.  The Superseding Indictment included three counts materially the same as the first Indictment: Count One: MGPI knowingly violated its general duty under the Clean Air Act (42 U.S.C § 7413(r)(1)), to prevent the accidental release and to minimize the consequences of any release of hazardous substances;[1] Count Two: MGPI and Harcros knowingly released and caused hazardous substances to be released, in violation of 42 U.S.C § 7413(c)(5); and Count Three:

---

[1] Harcros was never charged in Count One of the original or superseding Indictment.

MGPI and Harcros negligently released or caused hazardous substances to be released, in violation of 42 U.S.C § 7413(c)(4).

3.       On January 31, 2020, Harcros pleaded guilty to a misdemeanor violation pursuant to an agreed upon Information (Doc. 56) for negligently violating the Clean Air Act under 42 U.S.C. § 7413(c)(4), a Class A Misdemeanor.  Doc. 74.  This guilty plea is pursuant to and contingent upon a Fed. R. Crim. P. 11(c)(1)(C) proposed plea agreement, filed with the Court on January 31, 2020.  Doc. 76.

4.       The plea agreement for Harcros proposes a sentence that includes a stipulation to: a fine of $1,000,000.00; no order of restitution; no term of probation; and the mandatory special assessment of $125.00.  Doc. 76.  In entering into the plea agreement, the Government agreed to dismiss Count Two against Harcros at the time of sentencing, for knowingly releasing and causing hazardous substances to be released, in violation of 42 U.S.C § 7413(c)(5) and limit the facts to solely vicarious liability for the actions of the driver.  Harcros was never charged in Count One of either Indictment.

5.       MGPI appeared for a sentencing hearing on January 31, 2020. The Court continued the hearing.

6.       The parties will appear for a jointly scheduled sentencing hearing on May 27, 2020 at 1:30 pm.  Doc. 84.

## II.    Factual Background

Harcros is an international and domestic distributor and manufacturer of industrial and specialty chemicals.  It was formed in 1917 as Thompson, Munro, Robins Chemical Co. Through the years, Harcros has had several owners with Harcros-Kansas formed in 2001; the result now is an employee owned company.  Harcros operates in nineteen states with its

Manufacturing Division headquartered in Kansas City, Kansas and employs over 550 employees. It is an essential chemical business both internationally and domestically, especially now in our COVID-19 pandemic.

On October 21, 2016, a Harcros driver traveled to the MGPI facility, in Atchison, Kansas, to complete a scheduled delivery of 30% Sulfuric Acid. Harcros regularly distributes Sulfuric Acid, among other hazardous materials, to MGPI's Atchison's facility, for MGPI's use in processing product. Upon arrival, the MGPI operator unlocked the gate and removed the lock on the cam lever dust cap for the Sulfuric Acid fill line. He then placed the lock from the Sulfuric Acid fill line on the angle iron above the fill line. The Harcros driver was on the other side of the vehicle at the time, finishing donning his personal protective equipment. The Harcros driver then removed the seal from the cargo truck and handed it to the MGPI operator while he retrieved the hose to begin the connection. The Harcros driver then removed the dust cap from the first unlocked fill line that he saw, which he thought to be the Sulfuric Acid fill line, but which was in fact a Sodium Hypochlorite fill line. The driver did not know that the facility personnel had two unlocked fill lines in the unloading area when it should have been just one. Shortly after connecting the hose to the wrong line, a greenish yellow chlorine gas cloud began to form in the area and continued to grow for about 45 minutes, forming a plume containing toxic gas.

Harcros readily recognizes that its driver negligently failed to follow the company's SOP and response training that, if he had followed, may have helped mitigate, although not stop, the resulting size of the chemical combination. Harcros accepts full vicarious liability for its driver's negligence. However, for purposes of the court's consideration of relevant factors at sentencing and the proposed Rule 11(c)(1)(C), the limited scope of Harcros' involvement must also be

understood.  Harcros is involved in this matter because a single Harcros driver was doing his job on the day of the incident and is driver had no idea that when he attempted to make the delivery that MGPI had left an improper fill line unlocked. Instead of following this training by the company, the Harcros driver panicked and ran away when he saw the green chemical combination forming.   However, he has said and maintained that no amount of training by the company would have caused him to react differently that day.   As experts would have testified at the time of trial, the majority of individuals similarly situated would have had the same flight response.   Just like the victims living in Atchison, Kansas, the Harcros driver received immediate medical attention too.

 Additionally, it is also important to note what this proposed plea agreement and factual stipulation by the parties does not include, as it varies materially from the original allegations made by the Government.  While Harcros fully accepts responsibility for the charge and facts in which it has pleaded guilty, distinguishing those from the original charges is also relevant and vital to the Court's consideration of whether the proposed Rule 11(c)(1)(C) plea agreement is fair and reasonable.

 Pursuant to the plea agreement, the Government agreed to dismiss Count Two at the time of sentencing, which charged that Defendants' *knowingly* released chlorine gas into the air putting others in imminent danger.   There is no evidence showing that Harcros or its driver engaged in these acts intentionally or knowingly.   The Government also originally claimed that the company also had additional responsibility stating that the driver's training was not adequate and that the driver and truck was not equipped with adequate respiratory protection.  *Id.* ¶ 15. These factual claims, along with other originally charged claims for failings by the company,

will be dismissed at the time of sentencing pursuant to the proposed plea agreement.[2]   The Information and supporting stipulated facts only contain Harcros' vicarious liability for the specific negligent acts by the driver.

Further, at the time of the incident, Harcros had a robust compliance program in place, including extensive training, safety equipment, and standard operating procedures for its drivers. Even so, subsequent to the incident Harcros took additional measures to ensure that such an accident never happened again.  It is undisputed that Harcros also immediately cooperated with multiple government agencies who responded and subsequently investigated the incident.

Harcros also retained outside counsel to conduct an investigation so that it could implement its own corrective measures to ensure future compliance to avoid similar incidents. For example, Harcros modified and bolstered its driver training program and added an additional refresher training courses; instituted bulk customer delivery evaluations and audits; implemented a stop work policy for drivers; modified its standard operating procedures; modified its emergency action plan; upgraded unloading equipment; and reviewed all pipe and valve labelling.   Harcros also implemented a nation-wide compliance program, which included compliance coordinators at each site and compliance managers that coordinate with sites on a regional basis.  Here are some specific items that Harcros implemented as part of its efforts:

---

[2] Before the incident, the driver, who is a lead driver for Harcros, and other drivers with similar jobs, received extensive training and a detailed standard operating procedure ("SOP") to follow.  Harcros' training and SOP aligned with industry standards.  All Harcros employees' trainings were tracked so that employees had to renew their training on certain tasks before being eligible to continue to perform those tasks.  Despite his extensive training and his possession of the Harcros Tanker Unloading Safety Checklist at the time of the incident, the Harcros driver failed to follow protocol.

The Government charged that Harcros' failed to provide a full-face respirator as required by the safety data sheet.  The safety data sheet did not require a full-face respirator and, in any event, the safety data sheet was not applicable to chlorine gas that never should have been created in the first place at the time of delivery.

- Harcros outfitted the entire fleet of delivery trucks, to include over-the-road trucks, with Emergency Escape Respirators and provided training to each driver on the proper use of the respirators (a U.S. Chemical Safety and Hazard Investigation Board ("CSB") Recommendation);

- all bulk tanker drivers received hands-on refresher training on how to use various types of emergency shut-off devices on tanker trailers;

- emergency Shut-off signs and labels on tanker trailers were updated with larger, more visible signs;

- Harcros revised the KC Emergency Action Plan and company Hazard Communication Compliance Plan to include emergency actions to take while at customer's sites;

- All bulk tanker drivers received OSHA's 24-Hour Hazardous Materials Technician Level HAZWOPER training under 1910.120(q) criteria;

- Harcros updated the Delivery Instruction for Sulfuric 30% to MGPI;

- Harcros updated the Tanker Pre-Unloading Checklist to include additional safety instructions and customer sign-off;

- Harcros researched and purchased KemKey safety couplings[3] for chemical hose connections to piping systems.

- All Harcros employees were required to review the CSB investigation video and discuss lessons learned.

- Harcros developed a Safety Qualification for Loading and Unloading Questionnaire (bulk deliveries) at customer sites based on lessons learned from the MGPI incident.[4]

On May 8, 2017, Harcros agreed to a settlement with the Occupational Safety and Health Administration ("OSHA") where Harcros committed to correct the violations cited, pay a penalty of $6,337.50, and post a copy of its settlement agreement near the location of the violation.

[3] This is a uniquely designed hose coupling that prevents the inadvertent connection to the wrong chemical valve.  MGPI agreed to install the equipment on two of their chemical valves.  Harcros has partnered with other customers throughout the country to use KemKey safety couplings.

[4] This questionnaire is used throughout Harcros and covers the essential safety roles and responsibilities, safety equipment and overall safety conditions of customer sites. Harcros Operations Managers along with delivery drivers complete the form to help identify and correct any unsafe conditions or unsafe acts occurring at customer sites.  This information is shared with the Harcros management team to help ensure no unnecessary risks are being taken.

Harcros further agreed to continue compliance with OSHA regulations and to use the citation as a training tool.  Harcros has conducted trainings with various government agencies nation-wide to assist and benefit the industry.

Further that year, Harcros continued to bolster its already robust compliance program. The CSB recognized in its public report, published in December 2017, that Harcros made immediate changes to its transfer equipment and training.  *Key Lessons for Preventing Inadvertent Mixing During Chemical Unloading Operations:  Chemical Reaction and Release in Atchison, Kansas*, U.S. CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD CASE STUDY, 40–41 (published Dec. 2017), *available at* https://www.csb.gov/assets/1/20/mgpi_case_study.pdf?15915.  CSB also highlighted that Harcros worked with MGPI to select and install new connection equipment as well emergency response monitory and shutdown devices. *Id.*  Additionally, CSB applauded Harcros for revising its chemical unloading practices and procedures to ensure better coordination between operators and drivers.

All of these above remedial, response and compliance actions were taken prior to Harcros' knowledge that there would ever be a federal criminal prosecution.  The company did not learn about a federal criminal investigation until they received a grand jury subpoena issued April 4, 2018.

## III.  Sentencing Analysis

The relevant law and facts discussed below weigh heavily in favor of the Court's approval of the parties' agreement and proposed sentence.  The below contains an analysis of (A) 18 U.S.C. Section 3553 sentencing factors and (B) the statutory fine provisions of Sections 3572

and 3571(d).  Throughout this analysis Harcros also addresses any remaining items raised by the court at the most recently teleconference with the parties.

### A.  18 U.S.C. Section 3553 Factors

Section 3553(a)(2) enumerates the purposes of sentencing to be achieved by imposing "a sentence sufficient but not greater than necessary."  *Id.*  Four of the § 3553 factors are particularly pertinent for purposes of this sentencing:[5]  (1) the nature and circumstances of the offense, and history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the need to avoid sentence disparities among defendants with similar records; and (4) the need to provide restitution to any victims of the offense.  The § 3553 factors combined weigh in favor of approving the parties' plea agreement and proposed sentence and these four factors offer particular relevant context for the Court's consideration.   Harcros addresses a fifth factor— sentencing range—because in this circumstance, a guidelines range and pre-sentence investigation report ("PSR") are unnecessary.

     i.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of the offense and the history and characteristics of the defendant weigh in favor of the proposed sentence.  *See* 18 U.S.C. § 3553(a)(1).  Following the event on October 21, 2016, Harcros immediately and fully cooperated with the government agencies investigating the matter as discussed above.  For example, among other agencies, Harcros cooperated with the Atchison Fire Department, the Atchison County Department of Emergency Management, the Kansas Highway Patrol, the Atchison Police Department, the U.S.

---

[5] Two of the other three factors—kinds of sentences available and pertinent policy statements—are not particularly relevant here because of the nature of this distinctive environmental violation by a corporate defendant.

Department of Transportation, the CSB, the Environmental Protection Agency ("EPA"), and OSHA.

Independent of these government agencies, Harcros conducted its own internal investigation into the incident.  Harcros voluntarily produced these documents associated with the company's own internal investigation (including over 5,000 pages) to the government agencies well before ever receiving a grand jury subpoena or before knowing that the U.S. Attorney's Office was going to pursue the matter criminally.

Ultimately, the Government found MGPI more culpable than Harcros.  As the Superseding Indictment charges and explains, MGPI's standard operating procedure mandated that MGPI's operator was to be present during the connection and personally open the valve to the correct fill line to prevent accidents like this one.  Doc. 22 ¶6.  Additionally, MGPI was aware that the fill lines for incompatible chemicals were too close together and were not marked at the point of connect and failed to employ state of the art equipment to mitigate the risk.  *Id.* ¶14.  The Government brought an additional claim against MGPI—Count One of the Superseding Indictment—for violating a general duty under the Clean Air Act, as an owner and operator of a stationary source of hazardous substances, to minimize prevent accidental release of substances and minimize the consequences of any such release.  MGPI pleaded guilty to the actual charged Count Three in the Indictment.

Although MGPI was found to be more culpable than Harcros, MGPI did not have any record of prior environmental criminal violations.  Because of Harcros' prior record, described below, the Government required an increased penalty from Harcros which is incorporated within its total agreed $1,000,000 fine.

To be clear, Harcros has had no citations related to chemical unloading operations for trucks assigned to Kansas City, Kansas in the five years before this incident. Harcros' two previous environmental violations happened between 2006 and 2009.  Specifically, in 2014—for events between 2006 and 2009—Harcros pleaded guilty under Rule 11(c)(1)(C) plea agreement to knowingly storing hazardous waste for more than 90 days without a permit issued under the Resource Conservation and Recovery Act, violating 42 U.S.C. § 6928(d)(2)(A).  *See* Doc. 5 (Plea Agreement), *United States v. Harcros Chemicals Inc.*, 14-cr-20070-CM (D. Kan. Sept. 25, 2014).  The Court sentenced Harcros to 24 months probation and a $1,500,000.00 fine.  *See* Doc. 10 (Amended Judgment), *United States v. Harcros Chemicals Inc.*, 14-cr-20070-CM (D. Kan. Nov. 14, 2014).  This matter related to the finding, during a Kansas Department of Health and Environment inspection, that Harcros had stored hazardous chemicals at its facility for longer than the allotted duration, and under improper conditions (containers were degrading and/or next to corrosive and volatile acids).

Also, in 2017, Harcros entered into a consent decree with the EPA.  *See* Doc. 8 (Consent Decree), *United States of America v. Harcros Chemicals Inc.*, 17-CV-02432 (D. Kan Oct. 30, 2017).  On September 10, 2015, Harcros notified the EPA about certain discrepancies related to Risk Management Plans with facilities in Alabama, Kansas, and Louisiana.  *See id.*  Although Harcros does not have a "spotless" record, this history demonstrates that when Harcros discovers violations, it reports them and takes responsibility.  As a long standing chemical company necessary and essential to the operations of our country and abroad, Harcros incurs risk simply as a chemical manufacturer and distributer.  It has no choice but to operate and exist with risk and simply must mitigate and minimize that risk with robust compliance programs, mitigation measures, and extensive training.   Harcros spends over $3 million annually on these measures.

ii.     <u>The Need for the Sentence Imposed and The Need to Avoid Sentence</u>
<u>Disparities among Defendants with Similar Records</u>

The second and third factors under § 3553(a)(2) & (a)(6) weigh in favor of the proposed sentence. The proposed sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). The proposed sentence also affords adequate deterrence to criminal conduct. *See id.* § 3553(a)(2)(B). $1,000,000.00 fine is not insignificant. It certainly advances all the goals of this factor.

Also, the proposed sentence will not create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct under § 3553(a)(6). There are limited cases where corporate defendants have been convicted of a violation of 42 U.S.C. § 7413(c)(4). Three examples are *United States v. Motiva Enterprises, LLC*, 5-CR-00021 (D. Del.), *United States v. Copper River Campus, LLC*, 12-CR-00093 (D. Alaska), and *United States v. Team Industrial Services, Inc.*, 12-CR-00030 (N.D. Tex.). In both *Copper River Campus* and *Team Industrial Services*, the defendants were fined under 18 U.S.C. § 3571(c)(5). In *Motiva Enterprises*, defendant was fined $10,000,000.00 under the alternative fine provision in § 3571(d). Here, if the Court chooses to fine Harcros $1,000,000.00 under the alternative fine provision, it will not create unwarranted sentence disparities.

iii.     <u>The Need to Provide Restitution to Any Victims of the Offense</u>

The Court must also consider the need to provide restitution to any of the victims of the offense pursuant to both § 3553(a)(7), and the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771. In the case before the Court now, all identified and confirmed victims were made whole in advance of the sentencing. Section 3663A(c)(1)(B) of Title 18 of the United States Code requires restitution for any offense "in which an identifiable victim or victims has suffered a

physical injury or pecuniary loss," and all identified and confirmed victims were already made whole.

Specifically, there are three primary categories of restitution either already made or that will be made: (1) the restitution that MGPI paid to victims; (2) the civil lawsuit settlements, which are final and paid, but remain confidential; and (3) the pending civil claims that are yet to be settled or fully adjudicated, but for which the victims will eventually receive whatever the parties' (through settlement) or the court (through litigation) believes is just under the facts.

For the first category, as MGPI explains in its sentencing memorandum, "MGPI has made full restitution payments directly to victims or to medical care and other providers to which the victims otherwise would be indebted." *See* Doc. 69 at 1–2. After the event in their town of Atchison, MGPI immediately contacted local hospitals and paid for all affected patients' medical bills. As of January 2020, MGPI has already paid more than $675,000 to victims. *See* Doc. 69 (MGPI Sentencing Memo) at 4 ("MGPI paid more than $275,000 for medical and related services to victims. . . . MGPI paid more than $400,000 to individual victims."). Harcros' lesser role involving only its driver is extremely relevant to the Court's understanding as to why MGPI took the lead in addressing restitution in the company's town of Atchison without even consulting Harcros and why MGPI management visited the local hospital to address the issue on its own. It was MGPI's town, facility and local hospitals. MGPI was directly involved with the emergency response on the ground when the incident took place.[6]

For the second category, a number of claimed "victims" asserted themselves as plaintiffs and also sought recovery through civil process. Those civil matters were properly and separately

---

[6] On December 17, 2018, Harcros informed MGPI that it would provide reimbursement for its portion of those bills after reviewing the underlying documents. For purposes of sentencing, with the victims made whole, this issue remains outstanding to be resolved between MGPI and Harcros directly.

adjudicated.  Any amounts paid to victims were included in sealed civil settlements.  Similarly, for the third category, the victims who have pending lawsuits will receive restitution through the legal mechanism they elected to pursue.

When calculating any penalty proscribed by the Clean Air Act, 42 U.S.C.§ 7413(e) requires a court to consider, among other things, any payment by the violator of penalties previously assessed for the same violation.[7]  At least one court has interpreted this provision to include payments made in civil litigation.  *See United States v LTV Steel Co., Inc*., 116 F.Supp.2d 624 (W.D. Pa. 2000).

In sum, Defendants are unaware of any victims with outstanding medical bills or other pecuniary loss that has not been compensated or otherwise have invoked a separate avenue for relief through civil process. Thus, a sentence without a restitution order is appropriate here.

### iv.   The Court Need Not Consider a Guidelines Calculation or PSR

Finally, subsection 3553 (a)(4) instructs the Court to consider the sentencing range established for "the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines"—more simply, a USSG calculation.  However, the Court should not consider a guidelines calculation in this matter for several reasons.

---

[7] 42 U.S.C. 7413 (e) (1) reads:

In determining the amount of any penalty to be assessed under this section or section 7604(a) of this title, the Administrator or the court, as appropriate, **shall take into consideration** (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), **payment by the violator of penalties previously assessed for the same violation**, the economic benefit of noncompliance, and the seriousness of the violation. The court shall not assess penalties for noncompliance with administrative subpoenas under section 7607(a) of this title, or actions under section 7414 of this title, where the violator had sufficient cause to violate or fail or refuse to comply with such subpoena or action.

First, Harcros has expressly waived the preparation of a pre-sentence investigation report, including any USSG calculation.  *See* Doc. 74 (Change of Plea Hr'g).  The proposed Rule 11(c)(1)(C) plea agreement contains a stipulation to a set fine amount.  To the extent that the Court would like guidance as to whether the proposed fine is fair and reasonable and comports with similarly situated matters, a USSG computation is not the mechanism to provide that guidance to the Court as outlined below.

Second, the USSG section utilized in the proposed guideline computation by the U.S. Probation Office is incorrect.  USSG § 2Q1.2 is the guideline applicable for *individual defendants* not corporate defendants.[8]  Its purpose is to provide a guideline range to the Court for

---

[8] If the Court denies Harcros' objection and elects to still use apply the Guidelines calculated by the U.S. Probation Office that applies to individual and not corporate defendants, Harcros makes the following objections to the offense level computation and proposed enhancements.

*First*, Harcros objects to the imposition of a four-level enhancement for "disruption of public utilities and evacuation from the community" under USSG § 2Q1.2(b)(3).  Application Note 7 to this section also allows a two-level downward departure "[d]epending upon the nature of the contamination involved."  Here, only a small portion of the community was evacuated.  *See* Doc. 76 (Harcros Plea Agreement) ¶ 2f ("The Atchison County Department of Emergency Management ordered community members to shelter-in-place and to evacuate in some areas.").  These areas were small and insignificant and they did not actually leave the community at all.  In most areas, individuals were told to just shelter in place and do the opposite of evacuate.

There is limited case authority addressing an enhancement for evacuation, but when assessing other enhancements addressed in this section—such as substantial expense of clean up—it is clear that a less substantial expense   does not warrant the full four-level enhancement.  *United States v. Merino*, 190 F.3d 956, 958 (9th Cir. 1999) ("For an expenditure to be 'substantial' in this context, it ought to be of the same order of magnitude in its impact on the community.  At the least, it should be much greater in economic impact than the run-of-the-mill contamination.").  Here, the entire community was not impacted by an evacuation and so, Harcros objects to a four-level increase under USSG § 2Q1.2(b)(3).  Instead, Harcros proposes a two-level increase only.

*Second*, Harcros objects to the imposition of a nine-level enhancement for "substantial likelihood of death or serious bodily injury" under USSG § 2Q1.2(b)(2).  This increase applies "where the public health is seriously endangered."  Application Note 6 to USSG § 2Q1.2.  There was not bodily injury or death sustained in this matter and certainly not a substantial likelihood of such.  The individuals who received medical care referenced in the plea agreement were simply screened at the local hospital and released.  This was done in an abundance of caution to make sure that the emission did not cause harm.  Even the driver of the vehicle involved, who was most immediately and directly exposed, did not sustain a single injury.

There is limited case authority addressing the application of this increase, but *Merino* is once again instructive.  It counsels that "substantial" requires a commensurate impact on the community.  *Merino*, 190 F.3d at 958.  An increase under USSG § 2Q1.2(b)(2) is predicated on a "substantial

purposes of imposing a term of imprisonment for an individual defendant.  Harcros is an entity

corporate defendant and not an individual.  Corporate defendants fall under USSG Chapter 8.

However, even USSG Chapter 8 is only applicable to corporate defendants for certain

enumerated offenses.  These specific and enumerated offenses do not include the Clean Air Act.

This is directly stated by the USSG Chapter 8 and supporting case law.

Section 8A1.2(b) provides two methods for determining the fine for a corporate

defendant.  The first method—described in § 8C1.1— applies only to corporate defendants who

operate primarily for a criminal purpose or primarily by criminal means.  Harcros is a

longstanding legitimate international and domestic distributor and manufacturer of industrial and

specialty chemicals.  The Government has never alleged, and there are certainly no facts to

support, that Harcros operates for a criminal purpose or by criminal means.  This guilty plea

offense is for the company's vicarious liability for a set of narrow and specific negligent acts by

a driver on one day that resulted in an accident.  Thus, this section does not apply.

The second method is also inapplicable because it specifically applies to enumerated

offenses and 42 U.S.C. § 7413(c)(4) (Clean Air Act) is not among the offenses listed.  *See* USSG

§§ 8A1.2(b)(2); 8C2.1.

When these two methods do not apply, the Guidelines direct the Court to § 8C2.10.  *See*

USSG § 8A1.2 (b)(2) ("For any count or counts not covered under §8C2.1 (Applicability of Fine

---

likelihood of death or serious bodily injury."  Here, none of the individuals who were screened during the
incident sustained any bodily injury—let alone, serious bodily injury.  Thus, a nine-level increase is not
appropriate here.

*Third,* and finally, Harcros objects that the U.S. Probation Office failed to decrease the offense
level by four levels for Harcros' mitigating role in the offense.  *See* USSG § 3B1.2.  Harcros' driver
disconnected the hose to the wrong port; this is a minimal role in the offense.  The Government didn't
even charge Harcros in Count One of the original or superseding Indictment.  Harcros is the lessor co-
defendant in this matter.  *See* Application Note 4 to USSG § 3B1.2 ("[This reduction] is intended to cover
defendants who are plainly among the least culpable of those involved in the conduct of a group.").  Thus,
U.S. Probation Office should reduce Harcros' offense level by four levels. Based on the three objections
in Section II, Harcros' total offense level should be 8, not 22 as the Probation Office currently proposes.

Guidelines), apply §8C2.10 (Determining the Fine for Other Counts).").  Accordingly, a third

"catch-all" category for offenses not enumerated in § 8C2.1 applies.  For this category, the Court

is directed to step outside of the guidelines entirely and shall apply 18 U.S.C. §§ 3553 and 3572

to determine the appropriate sentence.  *See id* § 8C2.10.[9]

When courts have conducted a similar analysis for environmental offenses, they reached

the same result.  *See United States v. Comprehensive Envtl. Sols., Inc.*, No. 07-20037-1, 2009

WL 1856228, at *2 (E.D. Mich. June 29, 2009) ("Typically, a sentencing court begins its

analysis by determining the sentence prescribed by the United States Sentencing Commission

Guidelines ('U.S.S.G.' or 'the Guidelines').  *However*, the Guidelines are of <u>no</u> assistance when

sentencing corporate defendants convicted of offenses involving the environment." (citations

omitted, emphasis added)).  At bottom, for environmental offenses, the Court applies the

provisions of 18 U.S.C. §§ 3553 and 3572 alone.  *See United States v. BP Prod. N. Am. Inc.*, 610

F. Supp. 2d 655, 681 (S.D. Tex. 2009) ("The Sentencing Guidelines provisions on fines for

organizational defendants do not apply to environmental offenses.  Instead, under U.S.S.G.

---

[9] Although it does not apply to the Clean Air Act as stated above, if in fact overrules Harcros' objection and the Court proceeds with an offense level under § 8C2.3, then the Court must also conduct a number of other steps described in §§ 8C2.4–9.  Harcros notes these steps to preserve its objection to a culpability score under § 8C2.5.

Subsection (f) provides a three-point reduction to the culpability score for an effective compliance and ethics program.

Similarly, subsection (g)(1) provides a five-point reduction to the culpability score for self-reporting.  Both of these reductions apply to Harcros.  Harcros exercised due diligence to prevent and detect criminal conduct and otherwise promoted an organizational culture that encouraged ethical conduct and a commitment to compliance with the law.  *See id.* § 8B2.1 (Effective Compliance and Ethics Program).  Also, Harcros—prior to an imminent threat of disclosure or government investigation and within a reasonably prompt time after becoming aware of the incident—immediately reported the incident to appropriate governmental authorities, fully cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct.  *See id.* § 8C2.5(g)(1).  Accordingly, if the Court chooses to conduct an analysis under §§ 8C2.3–9, Harcros also qualifies for reductions under both § 8C2.5(f) and (g)(1).

Also, Harcros qualifies for downward departures under § 8C4.9 because it has paid significant remedial costs and received no gain from this offense.  Thus, Harcros' remedial costs greatly exceed its gain.

§ 8C2.10, a court is to 'determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572.'" (citation omitted)).

Here, the U.S. Probation Office conducted an offense level computation under USSG § 2Q1.2 that is used for individual defendants and not corporate defendants.  However, even if USSG Chapter 8 for corporate defendants was reviewed, the offense involved in this matter as a Clean Air Act violation falls outside of the USSG entirely.

In sum, a Guidelines calculation is not appropriate and Harcros objects to the U.S. Probation Office conducting an offense level computation under USSG for a violation of a corporate defendant under 42 U.S.C. § 7413(c)(b) (Clean Air Act).

Relatedly—just like the Guidelines—the Court also has broad discretion to proceed without a Presentencing Investigative Report, and one is not needed here given the nature of the violation.  "[A] district court may dispense with a presentence report if it finds that such a report is unnecessary."  *United States v. BP Prod. N. Am. Inc.*, 610 F. Supp. 2d 655, 723 (S.D. Tex. 2009) (citing *United States v. Cantu*, 786 F.2d 712, 712 n.1 (5th Cir.1986), *cert. denied*, 479 U.S. 847 (1986); *United States v. Colmenares–Hernandez*, 659 F.2d 39, 42–43 (5th Cir. 1981), *cert. denied*, 454 U.S. 1127 (1981)).  Federal Rule of Criminal Procedure 32(c)(1)(A) also permits a court to forgo a presentence investigation and report if "the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its finding on the record."  Fed. R. Crim. P. 32(c)(1)(A)(ii).  Because there is sufficient information in the record (and public information published by investigating entities like the U.S. Chemical Safety and Hazard Information Board) for the Court to meaningfully exercise its sentencing discretion, and there was no indication that the probation officer would

likely provide additional information, the Court should proceed without a presentencing report here.

It is a waste of judicial time and resources to (a) litigate USSG factual or guideline disputes when the USSG is entirely inapplicable to a Clean Air Act violation by a corporate entity defendant; and (b) utilize the U.S. Probation office to recycle information already provided by the parties in a matter with materially undisputed facts after the facts were investigated thoroughly over the past four years by multiple government agencies.

### B. Statutory Fine Analysis:  18 U.S.C. Section 3572 Factors & § 3571(d) Alternative Fine Provision

In addition to the § 3553 factors, the Court shall consider the factors in § 3572 when determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine.  18 U.S.C. § 3572(a).  These factors also weigh in favor of imposing the proposed fine amount.  Three of the eight factors listed in the statute are relevant here,[10] and weigh in favor of approval of the proposed sentence:  (1) the pecuniary loss inflicted upon others as a result of the offense; (2) whether restitution has been ordered or already made and the amount of such restitution; and (3) the measures taken by the organization to discipline responsible parties and prevent recurrence of such offenses.

*First*, the proposed fine directly accounts for "any pecuniary loss inflicted upon others as a result of the offense."  *See id.* § 3572(a)(3).  The proposed fine incorporates the alternative fine provision under 18 U.S.C. § 3571(d).  Section 3571(c)(5) limits fines for Class A misdemeanors (not resulting in death) to not more than $200,000.  But when the offense at issue resulted in a

---

[10] The other five factors (defendant's income/earning capacity, the burden that the fine will impose on defendant, the need to deprive defendant of illegally obtained gains, costs of imprisonment, and whether defendant can pass the expense of fine to consumers) relate to individual defendants and/or are not applicable given the nature of this environmental offense involving these corporate defendants.

pecuniary loss to a person other than the defendant, § 3571(d) authorizes a fine of "not more than

… twice the gross loss." *Id.* § 3571(d).

Harcros stipulates for purposes of the proposed sentencing that victims of the incident at

issue suffered a pecuniary loss of at least $675,000 or could have if MGPI had not paid for their

related costs; or the parties had not provided for related civil settlements. *See* Doc. 69 (MGPI

Sentencing Memo) at 4 ("MGPI paid more than $275,000 for medical and related services to

victims. . . . MGPI paid more than $400,000 to individual victims.").[11]  By proposing a

$1,000,000 fine, the plea agreement considers pecuniary loss to victims without running afoul of

the alternative fine provision.

*Second*, the proposed fine considers whether restitution has been ordered or already made

and the amount of such restitution.  In this case, Harcros respectfully requests that the Court to

forego restitution because MGPI already has made full restitution payments.  The Court may fine

Harcros up to twice the amount of restitution.  Some courts have fined defendant's twice the

restitution amount in addition to restitution.  *See U.S. v. Tocco*, 135 F.3d 116, 132 (2d Cir. 1998)

(affirming sentencing court's decision to impose a fine of twice the restitution amount).  And if

the defendant isn't paying restitution, a fine equaling twice the loss amount can be an appropriate

equalizer.  *See Gaind v. U.S.*, 871 F. Supp. 186, 188 (S.D.N.Y. 1994) ("Restitution by an

offender for losses caused is pertinent to other aspects of a sentence.  In this instance,

had restitution been reduced or eliminated, I would have considered a substantial fine, possibly

including up to twice the amount gained or lost on account of the crime.").

---

[11] A court only may impose a fine under § 3571(d) based on "*facts reflected in the jury verdict or admitted by the defendant.*"  *Id.* at 174–75 (citing *Blakely v. Washington*, 542 U.S. 296, 303 (2004)) (emphasis in original); *see also United States v. Day*, 700 F.3d 713 (4th Cir. 2012).  Pursuant to the proposed plea agreement, Harcros stipulates that—although the exact pecuniary loss is continuing to be litigated through civil process—persons other than Harcros have suffered or could have suffered a pecuniary loss of at least $675,000 if their costs were not paid for by the parties.

*Third*, the proposed fine considers measures taken by Harcros to prevent a recurrence of such an offense.  Harcros has taken both general and specific measures to ensure a similar incident does not occur again.  See above for the larger discussion of Harcros' remedial measures and compliance plan in Section II above.  Specific to the driver, Harcros issued the driver a "Letter of Expectation."  This letter served as a written warning.  In doing so, it outlined the driver's failure to comply with standard procedures and, as the name suggests, explained Harcros' expectations going forward.  Harcros also developed additional safety measures with MGPI to prevent future incidents during chemical exchanges.  Harcros also developed general safety initiatives.  These initiatives include, for example, an emergency escape respirator to be worn on every driver's belt, driver training program modifications and adding refresher training events, evaluations of bulk customers, upgrades to unloading equipment, and reviews of all pipe and valve labeling.

## IV.   Conclusion

For these reasons, Harcros Chemicals, Inc. respectfully requests that the Court accept the proposed Rule 11(c)(1)(C) plea agreement and enter the parties' proposed sentence of a fine of $1,000,000.00, no order of restitution, no term of probation, and the mandatory special assessment of $125.00.

Respectfully Submitted,

**HUSCH BLACKWELL LLP**

/s/  *Cynthia L. Phillips-Cordes*
Cynthia L. Phillips-Cordes, D. Kan. #26339
Kip B. Randall, D. Kan #27274
4801 Main Street, Suite 1000
Kansas City, MO 64112
Tele: (816) 983-8000
Fax: (816) 983-8080
cynthia.cordes@huschblackwell.com
kip.randall@huschblackwell.com

**ATTORNEYS FOR DEFENDANT
HARCROS CHEMICALS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

On May 4, 2020, a true copy of this document was served electronically through this

Court's CM/ECF system on all parties receiving electronic notice.


/s/  *Cynthia L. Phillips-Cordes*
Attorney for Defendant Harcros Chemicals, Inc.